UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, et al. | ) | |
| | ) | |
| v. | ) | No. 3:10-0548 |
| | ) | JUDGE CAMPBELL |
| NISSAN NORTH AMERICA, INC. & | ) | |
| SUBSIDIARIES | ) | |

MEMORANDUM

I. Introduction

The United States and Steve C. White, Revenue Agent of the Internal Revenue Service ("IRS"), who is employed in Large and Mid-Sized Business, Retailers, Food, Pharmaceuticals & Healthcare, Territory 7, in Nashville, Tennessee, filed a Petition To Enforce Internal Revenue Service Summons under 26 U.S.C. §§ 7402(b) and 7604(a). (Docket Nos. 1& 1-1) The petition is supported by Revenue Agent White's Declaration. (Docket No. 2) Nissan North America, Inc., and its subsidiaries ("Nissan") has filed a response (Docket No. 14), and the IRS has filed a Memorandum Of Law In Support Of Petition (Docket No. 14).

The Court held a hearing on December 30, 2010.[1] For the reasons set forth herein, the Petition To Enforce Internal Revenue Service Summons (Docket No. 1) is GRANTED.

II. Factual and Procedural Background

On November 13, 2009, Revenue Agent White submitted a Form 4564 Information Document Request Number COR-21 ("the IDR") to Jodi Jones, Tax Manager at Nissan, on the

---

[1]Proceedings to enforce an IRS summons are intended to be summary in nature, and defining the permissible scope of the hearing is a decision left to the discretion of the district court. United States v. Monumental Life Ins. Co., 440 F.3d 729, 736 (6th Cir. 2006). If the court "concludes that it cannot fairly decide the case on the evidence before it, the court is free to direct such further proceedings as its discretion dictates; conversely, if the evidence is sufficient, no further hearing is necessary." United States v. Will, 671 F.2d 963, 968 (6th Cir. 1982).

1

subject of "Disclosure Compliance."  The IDR in paragraph number 1 requested the production of thirty-one (31) different "complete signed and executed contracts, management letters, and/or agreements" of Nissan with various listed law, accounting, and consulting firms.  In paragraph number 2, the IDR also requested "complete contracts, management letters, and/or agreements with vendors/advisors that pertain to reportable transactions under Income Tax Regulation Section 1.6011-4, as effective to November 1, 2006 regarding the year ended March 31, 2006 and as modified effective to August 2, 2007 with respect to the year ended March 31, 2007." (Docket No. 14, Ex. C.)  In paragraph number 3, the IDR directed Nissan to "[l]ist and describe loss transactions, as defined and referenced below," and in paragraph number 4 to "[l]ist and describe any other reportable transaction, as defined and referenced below."  The IDR stated that its purpose was:

> To consider Reportable transactions under Reg. Section 1.6011-4 – (1) In general.  A reportable transaction is a transaction described in any of the paragraphs (b)(2) through (7) of this section.  The term transaction includes all of the factual elements relevant to the expected tax treatment of any investment, entity, plan, or arrangement, and includes any series of steps carried out as part of a plan.  There are six categories of reportable transactions: **listed transactions, confidential transactions, transactions with contractual protection, loss transactions, transactions with a significant book-tax difference, and transactions involving a brief asset holding period.**

(Id. (emphasis in original)).  The IDR directed Nissan to produce the requested information to Revenue Agent White at the IRS office located at 801 Broadway in Nashville by December 8, 2009.

In a document dated February 23, 2010, Nissan responded to the IDR.  (Docket No. 14, Ex. D.)  With regard to paragraph number 1 of the IDR, Nissan declined to provide complete signed and executed contracts, management letters and/or agreements with the specified vendors because "the information being requested is overly broad in nature and is not relevant to a particular tax or business matter."  (Id. at 1.)  As to paragraph number 2 of the IDR, Nissan

2

furnished copies of four contracts and related material, consisting of eight (8) exhibits, pertaining to transactions with significant book/tax differences. With respect to paragraph number 3, Nissan advised the IRS that it was not aware that it had participated in any loss transactions. As to paragraph number 4, Nissan advised the IRS that it was not aware that it had participated in any other reportable transactions. Nissan also advised the IRS:

> As part of the federal tax compliance process, the Taxpayer performs a significant amount of due diligence to gather information from sources both within and outside of the tax department related to Nissan's potential involvement in any reportable transactions. Based on this analysis, no reportable transactions were identified for the tax years ended 3/31/06 and 3/31/07.

(Id. at 2.)

On March 2, 2010, in furtherance of his investigation into the tax liability of Nissan for the taxable periods ended March 31, 2006, and March 31, 2007, Revenue Agent White issued to Nissan under 26 U.S.C. § 7602 the summons that is at issue in this case. (Docket No. 1-1; Docket No. 2, White Decl. ¶¶ 2-3.) The summons demanded production of 30 of the 31 documents that were requested in paragraph 1 of the IDR, but that Nissan declined to produce. For some unstated reason, the request for one of the documents requested in the IDR was dropped from the list included in the summons. The summons also requested a privilege log if Nissan alleged that any of the documents sought in the summons were subject to a privilege of any kind. The summons expressly excepted production of the documents Nissan produced on February 25, 2010, as Exhibits 1 through 8 in response to the IDR.[2] In accordance with 26 U.S.C. § 7603, Revenue Agent White served an attested copy of the summons on Nissan by personal delivery to Nissan's Assistant Treasurer and Director of Tax and Trade, Christopher J. Czarka. (Id. ¶ 4.)

---

[2]Although Nissan's letter was dated February 23, 2010, the summons referred to February 25, 2010, apparently the date Revenue Agent White received Nissan's letter.

Revenue Agent White avers that he took all administrative steps required by the Internal Revenue Code for issuance of the summons. (Id. ¶ 6.) As of the date he issued and served the summons on Nissan, and as of April 19, 2010, the day Revenue Agent White signed his declaration, Nissan had not been referred to the Department of Justice for criminal investigation, as defined in 26 U.S.C. § 7602(c). (Id. ¶ 7.) Revenue Agent White attests that the documentation sought in the summons is necessary to investigate properly the federal tax liability of Nissan for the taxable periods ended March 31, 2006, and March 31, 2007. (Id. ¶ 8.)

On March 15, 2010, Nissan appeared in response to the summons, but refused to comply with it. (Id. ¶ 5.) Nissan provided the IRS with a letter signed by Mr. Czarka, which provided the legal basis for Nissan's position that it would not submit the requested documents because it believed the summons to be overly broad and a "fishing expedition in which there is nothing but an idle hope that something may be discovered rather than a realistic expectation that something will be discovered." (Docket No. 14, Ex. F at 1-3.) Mr. Czarka criticized the summons because it failed to articulate a purpose for the document demand and it sought communications between Nissan and selected advisory firms on every topic that may have arisen over a two-year period. (Id. at 3.) Mr. Czarka also stated: "During this audit as with prior audits, Nissan has produced records in response to an investigation conducted pursuant to a legitimate purpose and would do so here, if the summons portrayed one." (Id.) He emphasized Nissan's familiarity with Treas. Reg. § 1.6011-4 and its due diligence efforts to comply with the requirement to disclose on the annual tax return any involvement in transactions that might be considered corporate tax shelters. He attached copies of questionnaires, covering every type of reportable transaction noted in the regulation, that were submitted to all appropriate individuals within Nissan who might have information relevant to the reporting requirements under the regulation. Based on the responses

4

to the questionnaires, Nissan was able to provide the IRS with the documents responsive to the IDR and to advise the IRS that Nissan was not aware of any reportable loss transactions or other reportable transactions. (Id. at 3-4.)

Mr. Czarka wrote:

> The only conceivable basis you have for issuing a summons is that Nissan failed to note one reportable transaction relating to moneys received from various states that it claimed were non-taxable under section 118 of the Code. Nissan submits that this omission was wholly inadvertent due to the complexity of that particular reporting obligation. Nissan had not in any way attempted to conceal this transaction involving a book/tax differential when it failed to specifically include it on Schedule M-3, as required, inasmuch as the company had reflected the item as a Schedule M adjustment to state tax expense on its tax return for the year.

(Id. at 4.) Despite the objections to the summons, Mr. Czarka indicated that Nissan was willing to discuss the scope of the summons or the purpose of the IRS inquiry to determine if responsive documents are available. (Id.)

Nissan has filed a copy of a Memorandum of Understanding ("MOU") between Nissan and the IRS with respect to the IRS audit of Nissan's tax years ending March 31, 2006, and March 31, 2006. (Docket No. 14, Ex. G.) The parties indicated their good-faith intentions to work diligently towards the timely completion of a Limited Issue Focused Examination ("LIFE"). The MOU limited the examination to issues identified on pages 3 and 4 of the MOU; however, the MOU also provided that tax shelters "will not be subject to a materiality threshold(s) and can be examined regardless of when they are identified[,]" and "[i]f a non-disclosed abusive tax shelter or listed transaction is discovered during the course of the examination, the IRS will expand the scope of the examination to include the issue. (Id. at 1-2.)

In response to Nissan's refusal to comply with the summons, the United States filed the instant petition to enforce the summons. Revenue Agent White personally served copies of the petition and the initial Order setting a hearing on the petition on Jodi Jones, who was designated

5

by Nissan as the IRS contact for the pending tax examination, and Susan Bakaitis, secretary to Mr. Czarka, with instructions to deliver the documents to Mr. Czarka or another appropriate corporate officer. Nissan is now represented by counsel.

The United States has also filed a Memorandum Of Law In Support (Docket No. 21) of the Petition in which it states that "the IRS has reason to believe that Nissan has moved all or some of its U.S. extended service contract business offshore to Bermuda, a tax haven country, with the possible purpose of structuring payments to outside professionals so as to avoid U.S. taxation of the company's gross receipts." (Docket No. 21, at 5). The United States further states that "IRS seeks to find out if certain reportable transactions, some having to do with the deductibility of expenses and fees pertaining to certain professional services contracts, were properly disclosed by Nissan." (Id.) As for the request for specific documents, "IRS examiners have, as a test sample, singled out a finite small number of these vendors and have requested information from Nissan about its transactions with these specific, well-identified vendors, and IRS anticipates that the business records it thus seeks will show that the taxpayer may have had reportable transactions with these vendors that the company may not have disclosed to taxing officials." (Id., at 5-6).

At the hearing, Nissan called IRS Revenue Agent White who testified that the purpose of the request was set forth in the IDR, and specifically related to exploring whether Nissan was using tax shelters in connection with certain Bermuda transactions. To that end, Mr. White stated that he sought 30 contracts involving 11 identified business entities. Mr. White testified that although Nissan sent him documentation stating that it had not participated in any "reportable transactions" or "loss transactions," he still sought the primary source documents identified in order that he could test the accuracy of that opinion.

III. Analysis

Upon petition of the United States, the district court has jurisdiction to enter appropriate orders that may be necessary or appropriate to enforce the internal revenue laws. 26 U.S.C. § 7402(a). "If any person is summoned under the internal revenue laws to appear, to testify, or to produce books, papers, or other data, the district court of the United States for the district in which such person resides or may be found shall have jurisdiction by appropriate process to compel such attendance, testimony, or production of books, papers, or other data." 26 U.S.C. § 7402(b).

In order to ensure the proper determination of federal tax liability, Congress endowed the IRS with expansive authority to gather information. United States v. Arthur Young & Co., 465 U.S. 805, 816 (1984). Title 26 U.S.C. § 7602 is the "centerpiece of that congressional design." Id. Under that statute, the IRS is authorized–for the purpose of ascertaining the correctness of any tax return, determining the liability of any person for any internal revenue tax, or collecting any such tax liability– (1) to examine any books, papers, records, or other data which may be relevant or material to such inquiry, (2) to summon the person liable for tax or any officer or employee of such person to appear at a given time and place named in the summons and to produce such books, papers, records, or other data, and (3) to take such testimony of the person concerned, under oath, as may be relevant or material to such inquiry. 26 U.S.C. § 7602(a). "The power of the IRS to investigate the records and affairs of taxpayers has long been characterized as an inquisitorial power, analogous to that of a grand jury, and one which should be liberally construed." United States v. Matras, 487 F.2d 1271, 1274 (8th Cir. 1973).

The IRS may not issue a summons or file a petition to enforce a summons under 26 U.S.C. § 7604 if a Justice Department referral for criminal investigation is in effect with respect to such taxpayer. 26 U.S.C. § 7602(d). In this case, where Revenue Agent White has attested in his Declaration that a Justice Department referral on Nissan has not been made, the court looks

7

to whether the summons was issued in good faith. United States v. Holmes, 614 F.2d 985, 987 (5th Cir. 1980).

In United States v. Powell, 379 U.S. 48, 57-58 (1964), the Supreme Court set out the analytical framework to govern enforcement decisions. The IRS need not meet any standard of probable cause to obtain enforcement of a summons. Id. at 57. Rather, to establish a *prima facie* case, the revenue agent must show (1) that the investigation will be conducted pursuant to a legitimate purpose, (2) the information summoned is relevant to that purpose, (3) the documents sought are not already in the possession of the IRS, and (4) the procedural steps required by the tax code have been followed, in particular, that after investigation the IRS has determined the further examination to be necessary and has notified the taxpayer in writing to that effect. Id. at 58; United States v. Monumental Life Ins. Co., 440 F.3d 729, 733 (6th Cir. 2006). "The requisite showing is generally made by the submission of the affidavit of the agent who issued the summons and who is seeking enforcement." United States v. Will, 671 F.2d 963, 966 (6th Cir. 1982). Once the government makes the *prima facie* showing, the burden shifts to the party being summoned to either disprove the elements of the *prima facie* case or demonstrate that judicial enforcement of the summons would otherwise constitute an abuse of the court's process. Monumental Life Ins. Co., 440 F.3d at 733. Such abuse would occur, for example, if the summons had been issued for an improper purpose to harass the taxpayer or to put pressure on the taxpayer to settle a collateral dispute, or "for any other purpose reflecting on the good faith of the particular investigation." Will, 671 F.2d at 967. The burden to show an abuse of the court's process is on the taxpayer, who is entitled to an adversary hearing to substantiate his allegations and to challenge the summons on any appropriate ground before enforcement can be ordered. Id. at 968; Powell, 379 U.S. at 58.

A district court asked to enforce an IRS summons must initially consider whether the summons was issued pursuant to a legitimate purpose of an IRS investigation. United States v. Richards, 631 F.2d 341, 345 (4th Cir. 1980). When the taxpayer is a corporation, the IRS is expressly authorized to summon corporate officers and employees to produce information which "may be relevant or material" to corporate tax liability. 26 U.S.C. § 7602(a)(2); Richards, 631 F.2d at 345. Congress chose the words, "may be" relevant, instead of "is" relevant, because the IRS often cannot be certain that documents are, in fact, relevant or material until after they are seen and evaluated. Richards, 631 F.2d at 345. This very low threshold for relevancy is satisfied when the United States shows that the inspection sought "'might' throw light upon the correctness of a return." Monumental Life Ins. Co., 440 F.3d at 735-36 (quoting Arthur Young, 465 U.S. at 814-15 & n.11). In other words, the IRS has a "realistic expectation rather than an idle hope that something may be discovered." United States v. Harrington, 388 F.2d 520, 524 (2nd Cir. 1968). "Thus, prior to judicial enforcement, the court must conclude that there is a realistic expectation that the information called for by the summons will throw light upon the respondent's federal tax liability." Richards, 631 F.2d at 345.

This relevancy standard is minimal because a higher standard might unduly interfere with the ability of the IRS to detect violations of federal revenue law. Id. In close cases, however, a mere assertion of relevance by an IRS agent will not necessarily satisfy the government's burden. Monumental Life Ins. Co., 440 F.3d at 736. A summons will be deemed unreasonable and will not be enforced if it is overbroad and disproportionate to the end sought–a veritable "fishing expedition" through a taxpayer's records that exceeds the relevant scope of the summons power. Richards, 631 F.2d at 345.

Nissan contends the IRS summons is overbroad and the documents sought are not relevant to the pending audit examination. The Court is not persuaded by Nissan's argument.

The IRS has identified a legitimate purpose for requesting the documents sought. The documents sought are relevant to that purpose. The documents are not already in the possession of the IRS, and the IRS has followed the necessary procedural steps required by law. Furthermore, the request for documents is not overbroad, but targeted to 30 contracts relating to 11 specific entities. Nissan's suggestion that the IRS is not entitled to the documents because the company has opined that they are not aware of any "loss transactions" or "reportable transactions" is not supported by applicable law.

IV. CONCLUSION

For the reasons set forth above, the Petition To Enforce Internal Revenue Service Summons (Docket No. 1) is granted.

IT IS SO ORDERED.

_____
TODD J. CAMPBELL
UNITED STATES DISTRICT JUDGE